IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SEMI-MATERIALS CO., LTD. and SMC SHANGHAI, <br><br> Plaintiffs, <br><br> vs. <br><br> MEMC ELECTRONIC MATERIALS, INC., and MEMC PASADENA, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 4:08-cv-00434 JCH |

**DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' DAMAGES CLAIM**

Defendants MEMC Electronic Materials, Inc. ("MEMC Electronic") and MEMC Pasadena, Inc. ("MEMC Pasadena") (collectively, "MEMC"), state that there is no genuine issue regarding the following material facts, and that, as discussed in "Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim" and the memorandum in support thereof, filed contemporaneously herewith, MEMC is entitled to summary judgment as to certain aspects of Plaintiffs' damages claim on Counts I-III.

**The Korea Document**

1.  Plaintiffs allege that at some time between the years 2002 and 2004, MEMC Pasadena's Marketing Manager, Sanjeev Lahoti, and Kun Park, the President of SMC and Semi-Materials, signed a document captioned "International Sales Representation Agreement" (the "Korea Document"). *See* Compl. ¶ 11, Doc. No. 1; *see* Korea Document, attached as *Exh. A*.

2.  The Korea Document states that Semi-Materials is appointed as MEMC Pasadena's "exclusive sales representative" in Korea for the sale of polysilicon and silane. *Id.* ¶ 1. It recites that MEMC Pasadena shall pay Semi-Materials a commission on all polysilicon and silane sales that are

"purchased from [MEMC Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [Korea]." *Id.* ¶ 7(a). It further recites that "compensation percentage rates are listed in Appendix A," and an Appendix A is attached to the document. *Id.*

3. The Korea Document states that it shall be in effect for an initial three-year term from July 1, 2003, to June 30, 2006. *Id.* ¶ 3.

## The China Document

4. Plaintiffs also allege that at some time between the years 2002 and 2004, Mr. Lahoti and Mr. Park signed a second document captioned "International Sales Representation Agreement" (the "China Document."). *See* Compl. ¶ 10, Doc. No. 1; *see* China Document, attached as *Exh. B*.

5. The stated parties to the China Document are MEMC Pasadena and SMC. *See Exh. B.* The China Document states that SMC is appointed as MEMC Pasadena's "exclusive sales representative" in China for the sales of polysilicon and silane. *See id.* ¶ 1.

6. It recites that MEMC Pasadena shall, among other things, pay SMC a commission on all polysilicon and silane sales that are "purchased from [MEMC Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [China]." *Id.* ¶ 7(a). The document states that "compensation percentage rates are listed in Appendix A." *Id.* However, no Appendix A accompanies the China Document. *See Exh. B.*

7. The China Document recites that it shall be in effect for a three-year term from January 2, 2004, to January 1, 2007. *See id.* ¶ 3.

## Summary of Plaintiffs' Damages Claim Under the Alleged Agreements

8. In support of its alleged damages claim under the alleged agreements, Plaintiffs disclosed an expert report by Patricia L. Pacey, Ph.D. *See* Pacey Report, attached as *Exh. C*. Dr. Pacey was deposed on July 17, 2009. *See* Pacey depo., July 17, 2009, attached as *Exh. D*.

9.     Dr. Pacey purported to calculate the sales commissions allegedly due under both the Korea Document and the China Document. *See Exh. C.* To do this, she reviewed invoices produced by MEMC during discovery in this litigation, and calculated the alleged sales commission due under each invoice assuming the validity of the alleged agreements. *See id.*

10.    Based upon her analysis, Dr. Pacey concluded that a total of $12,554,300 in allegedly unpaid commissions were due under the Korea Document and the China Document collectively. *See id.* p. 3, Table II.

### Plaintiffs' Inclusion of Sales Not Made by MEMC Pasadena

11.    Both of the alleged agreements at issue in Counts I through III include substantially the same provision specifically identifying the sales that were to be subject to the payment of a commission:

> "The compensation paid to the SALES REPRESENTATIVE, by the COMPANY, will be a percentage of the NET SALES PRICE of PRODUCTS that are purchases from the COMPANY by the user of the PRODUCTS and delivered by the COMPANY to a site within the TERRITORY." *Exh. A* ¶ 7(a); *Exh. B* ¶ 7(a).

12.    Each agreement defines "the COMPANY" to mean MEMC Pasadena. *See id.* at Preamble. In the alleged Korea agreement, "the TERRITORY" is defined to be Korea, while in the alleged China agreement, it is defined to be China. *See id.* ¶ 1.

13.    In making her damages analysis, however, Dr. Pacey did not consider whether MEMC Pasadena was even the MEMC making the particular sale at issue. *See Exh. D* at 39:11-39:19, 83:7-83:10. Rather, Dr. Pacey calculated alleged commission due under the asserted agreements even where a sale was made not by MEMC Pasadena, but by other MEMC entities including MEMC Electronic, MEMC Electronic Materials, SpA, and MEMC Singapore PTE, Ltd. *See id.* at 74:4-75:10.

14. During her deposition, Dr. Pacey conceded that she had not considered whether MEMC Pasadena had made a sale before calculating a commission, but had instead calculated a commission due on every invoice that MEMC had produced during the course of discovery:

> "Q      Is it fair to say you did not consider which MEMC [entity] entered into the purchase and sale contract with the buyer?
>
> A      That's correct.
>
> \*      \*      \*
>
> Q      As part of your analysis, did you attempt to determine whether or not all of the sales that you've included were sales of product that were purchased from MEMC Pasadena, Inc.?
>
> A      I don't know that the -- no, I wouldn't have specifically made that analysis. I assumed from the information I was -- I understood from the information I received that the MEMC production was for the relevant invoices for the claim." *Id.* 39:11-39:19; 83:7-83:10.

**Plaintiffs' Inclusion of Sales Not Delivered Into the Relevant Territories**

15. Each of the alleged agreements recites that commissions shall be paid only on sales "delivered by the COMPANY to a site within the TERRITORY." *Exh. A* ¶ 7(a); *Exh. B* ¶ 7(a). As previously noted, in the alleged Korea agreement, "the TERRITORY" is defined to be Korea, while in the alleged China agreement, it is defined to be China. *See id.* ¶ 1.

16. In making her damages analysis, however, Dr. Pacey did not consider whether a sale was delivered to the relevant territory. *See Exh. D* at 61:12-62:4 and 83:11-83:15. Instead, Dr. Pacey calculated that a commission was due on any sale to a Korea- or China-based company regardless of whether it was delivered to a site within either of those territories. *See id.* Dr. Pacey explained:

> "Q      [I]s it fair to say that you did not take into consideration where the polysilicon product itself was delivered?
>
> A      That's correct." *Id.* at 83:11-83:15.
>
> \*      \*      \*
>
> "Q      This purchase order has a ship-to address in Leon Valley, Texas; correct? The first page is the purchase order.

4

> A	Oh, this?  Yes.
>
> Q	Okay.  And so this would not be a shipment necessarily into -- into Korea; correct?
>
> A	Into Korea?  Doesn't look like it.
>
> Q	All right.  And is this purchase order and invoice included on your report and part of your analysis of an invoice that was included in your damages analysis?
>
> A	Yes." *Id.* at 61:12-61:23.

\*     \*     \*

> "Q	Why was this included in your report, or why was this included in your damage calculation?
>
> A	Because we understood that this was a shipment from a company in South Korea.  Or it's an invoice to a company in South Korea.  So the company itself is a South Korean company." *Id.* at 61:24-62:4.

### **Plaintiffs' Inclusion of Sales Not Delivered *By MEMC Pasadena* Into the Relevant Territories**

17.	Each of the alleged agreements requires that qualifying sales be "delivered *by the COMPANY* to a site within the TERRITORY."  *See Exh. A* ¶ 7(a); *Exh. B* ¶ 7(a) (emphasis added).

18.	The delivery term "EXW (Named Place)" or "Ex works:"

> "means that the seller delivers when he places the goods at the disposal of the buyer at the seller's premises or another named place (i.e, works, factory, warehouse,  etc.) not cleared for export and not loaded on any collecting vehicle."  Definition of "EXW" from Incoterms 2000, attached as *Exh. E*.

19.	The delivery term "FCA (Named Place)" or "Free Carrier:"

> "means that the seller delivers the goods, cleared for export, to the carrier nominated by the buyer at the named place.  It should be noted that the chosen place of delivery has an impact on the obligations of loading and unloading the goods at that place.  If delivery occurs at the seller's premises, the seller is responsible for loading.  If delivery occurs at any other place, the seller is not responsible for unloading . . . If the buyer nominates a person other than a carrier to receive the goods, the seller is deemed to have

5

      fulfilled his obligation the goods when they are delivered to that person." Definition of "FCA" from Incoterms 2000, attached as *Exhibit F*.

20.     The delivery term "FOB (Named Place)" or "Free on Board:"

      "means that the seller delivers when the goods pass the ship's rail at the named port of shipment. This means that the buyer has to bear all costs and risks of loss of or damage to the goods from that point. The FOB term requires the seller to clear the goods for export. This term can be used only for sea or inland waterway transport. If the parties do not intend to deliver the goods across the ship's rail, the FCA term should be used." Definition of "FOB" from Incoterms 2000, attached as *Exhibit G*.

21.     In making her damages analysis, however, Dr. Pacey did not consider the delivery terms of the transactions in order to ensure that they qualified for a commission under the alleged agreements. *See Exh. D* at 83:16-84:5.

## Plaintiffs' Inclusion of Alleged China Sales Made After Expiration of the China Document's Term

22.     The China Document recites that it shall be in effect for a three-year term from January 2, 2004, to January 1, 2007. *See Exh. B* ¶ 3.

23.     In making her damages analysis, however, Dr. Pacey was instructed by Plaintiffs' counsel to assume that the China Document was automatically renewed for two years. *See Exh. D.* at 56:9-56:16.

24.     "Q    And you were then informed that, no, we interpret this -- we being SMC Shanghai's lawyers -- to be that there is an automatic two-year extension?

      A    That what I was advised.

      Q    And so that's the basis for your -- the part of your report that says it was extended for two years automatically?

      A    Exactly." *Id.*

25.     Paragraph 3 of the China Document provides as follows:

      "The term of this AGREEMENT shall be three (3) years commencing from January 02, 2004 to January 01, 2007, unless

6

> sooner terminated as hereinafter provided in Paragraph 8.B. Thereafter, this AGREEMENT may be renewed for additional three (3) year terms upon agreement of both parties. The provisions of this AGREEMENT shall govern all transactions between the COMPANY and the SALES REPRESENTATIVE pertaining to the PRODUCTS. Thereafter, unless there is any dissent between two parties, this AGREEMENT shall automatically be extended for two years. After automatic extention [sic] of the AGREEMENT, it shall be renewed every five years by mutual consent." *Exh. B* ¶ 3.

26. Paragraph 8 further provides:

> "Though this AGREEMENT is not renewed by mutual consent given in writing by the parties hereto, it shall be automatically extended once for two years from the termination date of term specified in Paragraph 3. This AGREEMENT shall be renewed every five years by mutual consent given in writing of both parties." *Id.* ¶ 8.

27. Sanjeev Lahoti, the individual that allegedly signed the China Document on behalf of MEMC Pasadena, left MEMC in early 2007. *See* Kauffmann depo., July 1, 2009, at 40:6-40:7, attached as *Exhibit H*.

28. MEMC Electronic's Senior Vice President of Sales, John Kauffmann, had ultimate decision-making authority on issues relating the sale of polysilicon and silane. *See id.* at 57:17-57:20. He had never seen or heard of the China Document before it was presented by Plaintiffs' counsel in November 2007. *See id.* at 125:24-126:24.

29. MEMC Electronic's Senior Vice President of Sales and Service in 2003 and 2004, David Somo, had never seen or heard of the China Document before it was described and shown to him in 2009 during his deposition preparation. *See* Somo depo., July 30, 2009, at 10:14-11:9 and 51:23-52:18, attached as *Exh. I*.

30. Nabeel Gareeb, MEMC Electronic's CEO from 2002 through 2008, had never seen or heard of the alleged sales representation agreements until they were presented by Plaintiffs' counsel in November 2007. *See* Gareeb depo., May 21, 2009, at 146:13-148:1, attached as *Exh. J*.

31. In September 2006, Semi-Materials brought suit against MEMC Electronic and MEMC Pasadena in connection with unrelated transactions between the parties in a case styled *Semi-Materials Co., Ltd. v. MEMC Electronic Materials, Inc. et al.*, Case No. 06-cv-1426-FRB (E.D. Mo.). *See* Printout of Pacer Docket, attached as *Exh. K*. That suit remains pending today. *See id.*

**<u>Plaintiffs' Application of an Unwarranted Commission Rate to the China Document</u>**

32. The China Document states that "compensation percentage rates are listed in Appendix A." *See Exh. B.* ¶ 7(a). However, no Appendix A accompanies the China Document. *See Exh. B.*

33. Dr. Pacey testified that she had not seen Appendix A to the China Document, that "nobody has tracked down where it might be or if it was attached or whatever." *See Exh. D.* at 52:8-52:19.

34. Mr. Park initially testified that the omission of Appendix "A" of the China Document was "an error," and promised to find out where the document was. *See* Park depo., 105:8-105:12, attached as *Exhibit L*. Upon further questioning by Plaintiffs' counsel, however, Mr. Park changed his testimony, claiming that he understood the reference in Appendix "A" to refer to the Appendix "A" that had been attached to the Korea Document. *See id.* 178:2-178:14.

35. In making her damages analysis, Dr. Pacey applied the rates from Appendix "A" of the Korea Document to calculate alleged commissions due under the China Document. *See Exh. C.* p. 2.

36. Plaintiffs' counsel reviewed the alleged agreements before they were signed. *See Exh. L* at 98:14-99:3.

Dated: September 18, 2009

Respectfully submitted,

**BRYAN CAVE LLP**

By:_____
       Mark B. Leadlove #3654
       Ameer Gado #109918
       Bryan Cave LLP
       One Metropolitan Square
       211 North Broadway, Suite 3600
       St. Louis, Missouri 63102
       Tel. (314) 259-2000
       Fax. (314) 259-2020

**ATTORNEYS FOR DEFENDANTS MEMC ELECTRONIC MATERIALS, INC. and MEMC PASADENA, INC.**

**CERTIFICATE OF SERVICE**

    The undersigned hereby certifies that the foregoing was on this 18th day of September, 2009, served via email and deposited with U.S. Mail upon the following:

    Gregory P. Hansel, Esq.
ghansel@preti.com
Randall B. Weill, Esq.
rweill@preti.com
PRETI, FLAHERTY, BELIVEAU
& PACHIOS, LLP
One City Center
P.O. Box 9546
Portland, ME  04112-9546

Hardy C. Menees
menees@sbcglobal.net
Joann Trog
jtrogmwb@aol.com
MENEES, WHITNEY, BURNET & TROG
121 West Adams
Kirkwood, MO 63122


Attorneys for Plaintiff

_____