UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SEMI-MATERIALS CO., LTD. and SMC SHANGHAI, <br><br>Plaintiff(s), <br><br>vs. <br><br>MEMC ELECTRONIC MATERIALS, INC. and MEMC PASADENA, INC., <br><br>Defendant(s). | ) ) ) ) ) ) ) Case No. 4:08CV434 JCH ) ) ) ) ) ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants MEMC Electronic Materials, Inc. ("MEMC Electronic") and MEMC Pasadena, Inc.'s ("MEMC Pasadena") (collectively "MEMC" or "Defendants") Motion for Summary Judgment on Counts I-III (Sales Representation Documents), filed September 18, 2009. (Doc. No. 39). The matter is fully briefed and ready for disposition.

## BACKGROUND

MEMC Pasadena, a wholly-owned subsidiary of MEMC Electronic, manufactures granular polysilicon for use by MEMC Electronic and its affiliates, and also sells excess granular polysilicon to others. (Defendants' Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment as to Counts I-III ("Defendants' Facts"), ¶¶ 1, 2). MEMC Pasadena also manufactures and sells silane gas. (Id., ¶ 2). Polysilicon, whether in granular form, chunk form, or some other variation, is used as a raw material in the manufacture of polysilicon ingots. (Id., ¶ 3). Polysilicon ingots, in turn, are long cylinders or blocks that generally have diameters of several inches, which are sliced into wafers, then used in the manufacture of semiconductor chips and solar cells. (Id.).

Beginning in or around 1996, MEMC Pasadena entered into informal, short-term arrangements with World Tech Company (Semi-Materials Co., Ltd.'s predecessor in interest)[1], whereby MEMC Pasadena paid occasional commissions to Semi-Materials in exchange for assistance with the sale of silicon, and later silane. (Plaintiffs' Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment on Counts I-III ("Plaintiffs' Facts"), ¶ 57 and Defendants' Response thereto). The arrangements, entered into between Mr. Bob Onofrey, then MEMC Pasadena's Marketing Manager, and Mr. Kun Park, the President of Semi-Materials and a prior employee of MEMC in Korea, were not the subject of any written agreement, but periodically may have been discussed or memorialized in e-mail exchanges.[2] (Defendants' Facts, ¶¶ 4, 39; Plaintiffs' Facts, ¶ 58; Defendants' Response to Plaintiffs' Statement of Additional Material Facts Relating to Counts I-III ("Defendants' Response to Plaintiffs' Facts"), ¶ 57). Pursuant to the arrangements, MEMC Pasadena agreed to pay Semi-Materials a percentage commission on all sales of polysilicon by MEMC Pasadena to customers located in Korea. (Plaintiffs' Facts, ¶ 66). The commission rate varied between approximately 6 and 7 percent, based on the amount of "legwork" required for Mr. Park to develop the client relationship in Korea. (Id., ¶ 67).[3]

As part of their business relationship with respect to sales of polysilicon, and later silane, in Korea, Mr. Onofrey and Mr. Park saw each other approximately four times a year: typically Mr.

---

[1] World Tech Company and Semi-Materials Co., Ltd., a Korean corporation, hereinafter collectively are referred to as "Semi-Materials." (Compl., ¶ 6).

[2] Mr. Onofrey testified that had he remained at MEMC Pasadena, he likely would have explored a multiyear sales representation agreement with Mr. Park. (Defendants' Facts, ¶ 41; Defendants' Response to Plaintiffs' Facts, ¶ 73). He further testified that while he would have possessed the authority to generate a document memorializing such an agreement, he would have had to seek approval from his superiors prior to entering into such agreement. (Defendants' Facts, ¶ 41).

[3] Mr. Onofrey testified there was, "no set written level of money that [he] had total approval over." (Defendants' Response to Plaintiffs' Facts, ¶ 70).

Onofrey would visit Korea twice a year, and Mr. Park would visit the Pasadena plant twice a year. (Plaintiffs' Facts, ¶ 64). The two men also spoke via telephone approximately once a month, to discuss issues such as MEMC silicon production. (Id.).

When Mr. Onofrey left MEMC Pasadena, Mr. Sanjeev Lahoti took over his position as marketing and sales manager. (Plaintiffs' Facts, ¶ 71; Defendants' Facts, ¶¶ 4, 18). While Mr. Onofrey does not recall any specific conversations, he testified he most likely would have informed Mr. Park that Mr. Lahoti was assuming Mr. Onofrey's position, and that Mr. Lahoti would work with Mr. Park on everything that Mr. Onofrey had, including the informal short-term commission arrangements. (Defendants' Response to Plaintiffs' Facts, ¶ 72). From 2001 through 2004, Mr. Lahoti was MEMC's primary sales person responsible for sales of polysilicon and silane, and as such, he had primary customer contact and a direct relationship with MEMC's customers for all issues relating to the sales of such products. (Plaintiffs' Facts, ¶¶ 78, 81).[4]

Sometime in 2003, after Mr. Lahoti succeeded Mr. Onofrey, Semi-Materials asked Mr. Lahoti to enter into a written agreement on behalf of MEMC Pasadena. (Plaintiffs' Facts, ¶ 83 and Defendants' Response thereto). Semi-Materials sent an initial draft to Mr. Lahoti, who ultimately "finished the rest of the document." (Defendants' Response to Plaintiffs' Facts, ¶ 85). According to Plaintiffs, on July 18, 2003, Mr. Park, on behalf of Semi-Materials, and Mr. Lahoti, on behalf of

---

[4] Defendants maintain that while Mr. Lahoti was the "first line" salesperson, he did not have absolute authority with respect to polysilicon and silane sales. (Defendants' Response to Plaintiffs' Facts, ¶ 78). Rather, Defendants assert the ultimate decision as to whether to enter into an agreement for the sale of those items was made by Mr. John Kauffmann, MEMC Electronic's Vice President of Marketing and Sales. (Id.; Defendants' Facts, ¶¶ 19, 21). Plaintiffs conversely maintain that before 2007, Mr. Lahoti had the authority to proceed with a sale independently, if the price were above a particular "price floor." (Plaintiffs' Statement of Material Facts as to which Genuine Issues of Facts Exist in Opposition to Motion for Summary Judgment as to Counts I-III ("Plaintiffs' Response to Defendants' Facts"), ¶ 21). Plaintiffs further assert that, even assuming Mr. Lahoti required certain approvals for purchase orders, such internal approval requirements were neither presented nor revealed to the customers with whom Mr. Lahoti had direct contact. (Plaintiffs' Facts, ¶ 111).

MEMC Pasadena, signed a document captioned "International Sales Representation Agreement" (the "Korea Agreement").[5] (Plaintiffs' Facts, ¶ 86; Defendants' Facts, ¶ 4, citing Defendants' Exh. B). While Plaintiffs maintain Mr. Lahoti informed Mr. Park he had the authority to sign agreements such as the Korea Agreement, and that Mr. Bill Cooke and Mr. Sam Tennison (both former presidents of MEMC Pasadena) had previously confirmed Mr. Lahoti's authority at MEMC over polysilicon and silane sales, Defendants deny Mr. Lahoti possessed actual or apparent authority to execute the Korea Agreement. (Plaintiffs' Facts, ¶¶ 87, 88 and Defendants' Response thereto; Defendants' Facts, ¶¶ 31, 32).[6] The Korea Agreement stated that Semi-Materials was appointed MEMC Pasadena's "exclusive sales representative" in Korea for the sale of polysilicon and silane, and that MEMC Pasadena would pay Semi-Materials a commission[7] on all polysilicon and silane sales that were, "purchased from [MEMC Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [Korea]." (Defendants' Facts, ¶ 5). The Korea Agreement further recited numerous purported duties for Semi-Materials, including that Semi-Materials should: "(i) maintain an adequate sales force and use its best efforts to solicit orders for MEMC Pasadena; (ii) recommend improvements to sales plans and assist in developing strategy; (iii) seek opportunities to enhance the reputation of MEMC Pasadena and its products in Korea; (iv) provide timely identification and

---

[5] Although the Korea Agreement purportedly was signed on July 18, 2003, on its face it claims to have been entered into as of May 1, 2002, and to be in effect for a three year term commencing July 1, 2003. (Defendants' Facts, ¶¶ 7, 8).

[6] Defendants do not deny Mr. Lahoti represented that he had the requisite authority. Rather, Defendants maintain they were unable to obtain discovery from Mr. Lahoti on the issue, because Mr. Lahoti invoked the protections of the Fifth Amendment during his deposition in this matter as to his communications and dealings with Plaintiffs and Mr. Park, in light of an ongoing federal investigation relating to Mr. Lahoti's potential involvement in the theft of trade secrets from MEMC. (Defendants' Response to Plaintiffs' Facts, ¶¶ 87, 94).

[7] The commission rate was to be determined in accordance with Appendix A. (Defendants' Facts, ¶ 5).

assessment of any customer problems, and help protect MEMC Pasadena's reputation; (v) provide monthly reports of sales activities; (vi) provide competitive marketing information; (vii) provide business climate information; and (viii) develop and provide 30-day, 90-day and 12-month forecasts for sales volume, revenue, and average selling price by both customer and product type." (Id., ¶ 6).[8]

According to Plaintiffs, Mr. Lahoti told Mr. Park that MEMC needed a company to serve as its representative in China for MEMC's solar business. (Plaintiffs' Facts, ¶ 89).[9] Semi-Materials thus established a subsidiary, SMC Shanghai ("SMC"), to represent MEMC in China. (Id., ¶ 90). To protect its interests, Semi-Materials requested that MEMC Pasadena enter into an agreement, similar to the Korea Agreement, with respect to China. (Id.). Thereafter, according to Plaintiffs, on April 1, 2004, Mr. Park, on behalf of SMC, and Mr. Lahoti, on behalf of MEMC Pasadena, signed a second document captioned "International Sales Representation Agreement" (the "China Agreement").[10] (Plaintiffs' Facts, ¶ 91; Defendants' Facts, ¶ 10, citing Defendants' Exh. D).[11] Like the Korea Agreement, the China Agreement stated that SMC was appointed MEMC Pasadena's "exclusive sales representative" in China for the sale of polysilicon and silane, and that MEMC Pasadena would pay SMC a commission[12] on all polysilicon and silane sales that were, "purchased from [MEMC

---

[8] MEMC alleges neither SMC nor Semi-Materials can produce evidence that they performed their obligations under the Agreements. (Defendants' Facts, ¶ 50).

[9] As noted above, Defendants maintain they can neither confirm nor deny any of Mr. Lahoti's alleged representations, as they were unable to obtain the necessary discovery due to Mr. Lahoti's invocation of his right against self-incrimination.

[10] The China Agreement purportedly was signed on April 1, 2004, but on its face claims to have been entered into as of May 1, 2002, and to be in effect for a three year term commencing January 2, 2004. (Defendants' Facts, ¶¶ 13, 14).

[11] Defendants again deny Mr. Lahoti possessed actual or apparent authority to sign the China Agreement. (Defendants' Response to Plaintiffs' Facts, ¶ 91).

[12] As with the Korea Agreement, the commission rates under the China Agreement were to be determined in accordance with Appendix A. (Defendants' Facts, ¶ 11). According to Defendants,

Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [China]." (Defendants' Facts, ¶ 11). The China Agreement recited the same purported duties for SMC as did the Korea Agreement for Semi-Materials. (Id., ¶ 12). While Plaintiffs maintain no one at MEMC ever informed Mr. Park that Mr. Lahoti lacked authority to sign the Korea and China Agreements, Defendants maintain this is because no one at MEMC was aware of the documents until November, 2007, when Plaintiffs' counsel sent copies of the documents to MEMC's counsel on the eve of a mediation in an unrelated lawsuit between Plaintiffs and Defendants. (Plaintiffs' Facts, ¶ 93 and Defendants' Response thereto; Defendants' Facts, ¶ 16).[13]

Plaintiffs filed their Complaint in this matter on March 31, 2008, alleging Defendants violated the Korea and China Agreements.[14] (Doc. No. 1). Specifically, Plaintiffs allege Defendants contracted to sell substantial quantities of polysilicon in both China and Korea, without paying Semi-Materials or SMC the required commissions. (Compl., ¶¶ 14-16, 19-20). Plaintiffs further allege Defendants sold silane in China to Ling Gas and Hwanan Special Gas during the terms of the China Agreement, without paying SMC the required commissions. (Id., ¶¶ 17-18). As relevant here, Plaintiffs thus assert the following claims: Breach of Contract (SMC v. MEMC Pasadena, regarding

---

however, no Appendix A accompanies the China Agreement. (Id.). Plaintiffs counter that although Semi-Materials has been unable to locate a copy of Appendix A to the China Agreement, Mr. Park testified as to his understanding that, because the China Agreement contemplated sales of the same products from the same manufacturer, the commission rates were to be the same as under the Korea Agreement. (Plaintiffs' Response to Defendants' Facts, ¶ 11).

[13] It is undisputed that neither Mr. Kauffmann, Mr. David Somo, MEMC Electronic's Senior Vice President of Global Sales and Service, nor Mr. Nabeel Gareeb, then MEMC Electronic's Chief Executive Officer, had seen or heard of the alleged sales representation agreements until Plaintiffs' counsel provided copies in November, 2007. (Defendants' Facts, ¶¶ 25, 26, 27, 35, 37). Plaintiffs assert MEMC itself was aware of the Korea and China Agreements long before November, 2007, however, as it regularly approved check requests for commission payments to Semi-Materials during the years preceding November, 2007. (Plaintiffs' Response to Defendants' Facts, ¶ 16).

[14] Plaintiffs further allege MEMC Electronic interfered with a Subagent Agreement between Semi-Materials and SGL Carbon Korea, Ltd., a claim not at issue in the present motion.

MEMC Pasadena's alleged failure to pay SMC commissions on sales of polysilicon and silane in China) (Count I); Breach of Contract (Semi-Materials v. MEMC Pasadena, regarding MEMC Pasadena's alleged failure to pay Semi-Materials commissions on sales of polysilicon and silane in Korea) (Count II); and Tortious Interference with Contract (Plaintiffs v. MEMC Electronic, regarding MEMC Electronic's alleged interference with the sales representation agreements between Plaintiffs and MEMC Pasadena) (Count III). As stated above, Defendants filed the instant Motion for Summary Judgment on September 18, 2009, asserting there exist no genuine issues of material fact and they are entitled to judgment as a matter of law on Counts I-III of Plaintiffs' Complaint. (Doc. No. 39).

## **SUMMARY JUDGMENT STANDARD**

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at

247. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Id. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

**I. Counts I Through III Fail Because Mr. Lahoti Lacked Authority To Enter Into The Alleged Agreements**

In their Motion for Summary Judgment, Defendants first assert Counts I through III of Plaintiffs' Complaint fail, because Mr. Lahoti lacked authority to enter into the alleged agreements. (Defendants' Memorandum in Support of Motion for Summary Judgment on Counts I-III (Sales Representation Agreements) ("Defendants' Memo in Support"), PP. 7-12).[15] As a result, Defendants maintain the Korea and China Agreements are invalid and unenforceable, and thus cannot form the basis of a claim for breach of contract or tortious interference. (Id., P. 7).

"Texas law[16] does not presume agency and the party asserting agency has the burden of proving it." DB Sterling Investments, L.P. v. Pro M&E, Inc., 2009 WL 2045307 at *3 (Tex. App. Jul. 16, 2009) (citation omitted). "Absent actual or apparent authority, an agent cannot bind a principal." Lifshutz v. Lifshutz, 199 S.W.3d 9, 22 (Tex. App. 2006) (citation omitted). "Both actual

---

[15] Defendants apparently question whether Mr. Lahoti executed the Agreements in the first instance. (See Defendants' Facts, ¶¶ 9, 15; see also Defendants' Memo in Support, P. 4 n. 2). Plaintiffs dispute this, however, and the Court will not grant summary judgment on this basis.

[16] The parties assume for purposes of the instant motion that Texas law applies to the issue of contract formation. (See Defendants' Memo in Support, P. 7 n. 3; Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment as to Counts I-III ("Plaintiffs' Opp."), PP. 9-14).

and apparent authority are created through conduct of the principal communicated either to the agent (actual authority) or to a third party (apparent authority)." Id., citing Suarez v. Jordan, 35 S.W.3d 268, 272 (Tex. App. 2000).

In their response to Defendants' Motion for Summary Judgment, Plaintiffs do not assert Mr. Lahoti possessed actual authority to execute the agreements on Defendants' behalf. Rather, Plaintiffs maintain Mr. Lahoti had apparent authority to enter into the International Sales Representation Agreements on behalf of MEMC Pasadena. (Plaintiffs' Opp., PP. 9-14). "[A]pparent authority is determined by looking to the acts of the principal and ascertaining whether those acts would lead a reasonably prudent person using diligence and discretion to suppose the agent had the authority to act on behalf of the principal." Suarez, 35 S.W.3d at 273 (citations omitted). "The essential elements required to establish apparent authority are: (1) a reasonable belief in the agent's authority, (2) generated by some holding out or neglect of the principal, and (3) a justifiable reliance on the authority." DB Sterling, 2009 WL 2045307 at *3 (citations omitted).

The Court begins its analysis by recognizing that in determining whether apparent authority exists, "[o]nly the conduct of the principal may be considered; representations made by the agent of his authority have no effect." Suarez, 35 S.W.3d at 273 (citations omitted). Thus, "the principal must either have affirmatively held the agent out as possessing the authority or the principal must have knowingly and voluntarily permitted the agent to act in an unauthorized manner." Id. (citations omitted). See also DB Sterling, 2009 WL 2045307 at *5 (citation omitted) ("Apparent authority arises when a principal intentionally or negligently induces parties to believe that a person is the principal's agent though the principal has not conferred any authority on that person."); Lifshutz, 199 S.W.3d at 22 (citation omitted) ("Apparent authority arises through acts of participation, knowledge, or acquiescence by the principal that clothe the agent with the indicia of apparent authority.").

Upon consideration, the Court finds a genuine issue of material fact remains with respect to whether Mr. Lahoti possessed apparent authority, sufficient to permit Plaintiffs to rely on his ability to enter into the International Sales Representation Agreements on MEMC Pasadena's behalf. Specifically, as noted above MEMC began paying commissions to Semi-Materials in exchange for assistance with the sale of silicon and later silane in approximately 1996. (Plaintiffs' Facts, ¶ 57 and Defendants' Response thereto). Over the course of several years, MEMC paid over three hundred thousand dollars to Semi-Materials for its work in this regard. (Plaintiffs' Response to Defendants' Facts, ¶ 51). A number of these payments resulted from Semi-Materials' dealings with Mr. Lahoti who, according to Plaintiffs, was the only person at MEMC who had direct contact with customers interested in purchasing polysilicon and silane. (Plaintiffs' Opp., PP. 2, 11). The Court thus finds that despite MEMC's professed ignorance as to the alleged agency agreements, its prior authorization of large commission payments constituted, at minimum, neglect on MEMC's part sufficient to generate a reasonable belief in Mr. Lahoti's authority as agent. DB Sterling, 2009 WL 2045307 at *3.[17]

The Court further finds a genuine issue remains with respect to whether Plaintiffs' reliance on Mr. Lahoti's apparent authority was reasonable. As noted above, prior to executing the Korea Agreement, Semi-Materials had worked with MEMC's polysilicon sales managers for approximately seven years, in connection with polysilicon and silane sales in Korea. (Plaintiffs' Opp., P. 13). Semi-Materials received commission payments from MEMC without incident throughout Mr. Onofrey's tenure, and the payments continued when Mr. Lahoti assumed the position. (Id.). Plaintiffs' decision to pursue and negotiate the desired written agreements with Mr. Lahoti, MEMC's admitted salesperson responsible for sales of polysilicon and silane and Plaintiffs' primary (if not sole) contact

---

[17] The Court's finding is bolstered by the undisputed fact that in December, 2005, Mr. James Huang, MEMC's chief representative and sales manager in China, introduced Mr. Park of SMC as MEMC's agent for the sale of polysilicon and silane in China. (Plaintiffs' Facts, ¶ 101).

at MEMC, arguably was reasonable. Thus, while a party dealing with an agent must ascertain both the fact and the scope of the agent's authority or proceed at its own risk, Suarez, 35 S.W.3d at 273, the Court finds Plaintiffs successfully present evidence tending to demonstrate they fulfilled their obligation in this regard. This portion of Defendants' Motion for Summary Judgment must therefore be denied.[18]

## II. Counts I And II Fail Because Plaintiffs Failed To Perform Under The Alleged Agreements

In their Motion for Summary Judgment, Defendants next assert Counts I and II fail because Plaintiffs themselves failed to perform under the alleged agreements. (Defendants' Memo in Support, PP. 12-13). Specifically, Defendants maintain Plaintiffs failed to provide MEMC Pasadena with the sales forecasts, sales activity reports, and other documentation called for under the alleged agreements. (Id., P. 13).

By way of response, Plaintiffs note Mr. Park testified that Semi-Materials and SMC often performed their obligations by providing the requested information verbally via telephone. (Plaintiffs' Opp., P. 14, citing Plaintiffs' Response to Defendants' Facts, ¶ 50). Plaintiffs further note they produced, "extensive documentation reflecting the performance of their obligations pursuant to the Agreements, including the provision of reports to MEMC about market conditions in Korea and China for polysilicon and silane." Id. The Court finds this evidence sufficient to raise an issue of fact

---

[18] Plaintiffs have moved for partial summary judgment on the issue of Mr. Lahoti's alleged apparent authority to enter into the Korea and China Agreements on behalf of MEMC Pasadena. (Doc. No. 33). Upon consideration, the Court finds fact questions remain with respect to the circumstances under which the Agreements were executed in the first instance, as well as whether Plaintiffs possessed a reasonable belief in Mr. Lahoti's authority, generated by some holding out or neglect on the part of MEMC. Plaintiffs' Motion for Partial Summary Judgment must therefore be denied.

- 11 -

as to whether Plaintiffs performed their obligations. This portion of Defendants' Motion for Summary Judgment will therefore be denied.

### III. MEMC Electronic Is Entitled To Summary Judgment On Count III Because The Alleged Agreements Are Invalid[19], MEMC Electronic Was Unaware Of Them, And Took No Action To Interfere With Them

To succeed on a tortious interference claim in Missouri, Plaintiffs must prove: "(1) the existence of a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) the absence of justification; and (5) damages." Tamko Roofing Products, Inc. v. Smith Engineering Co., 450 F.3d 822, 829 (8th Cir. 2006) (internal quotations and citations omitted). "To prevail on this tort claim, a party must adduce substantial evidence supporting each and every element." Service Vending Co. v. Wal-Mart Stores, Inc., 93 S.W.3d 764, 769 (Mo. App. 2002) (citation omitted). Moreover, liability for tortious interference, "'cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis.'" Tamko Roofing Products, 450 F.3d at 830 (quoting Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n, 670 S.W.2d 895, 905 (Mo. App. 1984)).

In their final argument in favor of summary judgment, Defendants maintain they could not have interfered with the Korea and China Agreements because they were completely unaware of the alleged contracts, and because any alleged interference was justified. (Defendants' Memo in Support, PP. 13-16).

### A. Was MEMC Electronic Aware Of The Alleged Agreements?

---

[19] In light of the Court's ruling in Section I, supra, Defendants are not entitled to summary judgment on their claim the agreements themselves are invalid and unenforceable.

As stated above, Defendants maintain the earliest anyone at MEMC (with the possible exception of Mr. Lahoti) became aware of the alleged sales representation agreements was November, 2007, when Plaintiffs' counsel provided copies to Defendants' counsel on the eve of a mediation in an unrelated lawsuit. (Defendants' Memo in Support, P. 14). Plaintiffs counter that at the least, some MEMC employees were aware of the Korea and China Agreements long before November, 2007, as they regularly approved check requests for commission payments to Semi-Materials during the years preceding November, 2007. (Plaintiffs' Opp., P. 15). With this assertion, Plaintiffs successfully create a genuine issue of fact as to whether MEMC Electronic was aware of the alleged agreements.

### B.     Did MEMC Electronic Interfere With The Alleged Agreements?

Defendants next assert they did not interfere with the alleged agreements at all, much less through improper means. (Defendants' Memo in Support, PP. 15-16). As stated above, to succeed on its tortious interference with contract claim, Semi-Materials must prove that any alleged interference was unjustified. Tamko Roofing Products, 450 F.3d at 829. "To establish the absence of justification element, the plaintiff must establish that the defendant lacked a legal right to justify [its] actions." Avidair Helicopter Supply, Inc. v. Rolls-Royce Corp., 2009 WL 3161168 at *5 (W.D. Mo. Sep. 28, 2009) (internal quotations and citation omitted). "If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff must show that the defendant employed improper means in seeking to further only his own interests." Stehno v. Sprint Spectrum, L.P., 186 S.W.3d 247, 252 (Mo. 2006) (citation omitted). Competitive conduct is justified, as is interference taken to avoid a "substantial loss." Environmental Energy Partners, Inc. v. Siemens Building Technologies, Inc., 178 S.W.3d 691, 703 (Mo. App. 2005).

> One who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own economic

>interest and is not liable for such interference if his action was one which he had a definite legal right to take without any qualification. That is, protecting one's economic interest constitutes justification for interference with a business expectancy unless one employs improper means to protect that interest. Improper means are those which are independently wrongful notwithstanding injury caused by the interference.

Id. (citations omitted). Improper means include, "those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." Avidair Helicopter, 2009 WL 3161168 at *5 (internal quotations and citations omitted). As stated above, Plaintiffs have the burden of producing substantial evidence to establish an absence of justification. Cordry v. Vanderbilt Mortg. & Finance, Inc., 370 F. Supp. 2d 923, 933 (W.D. Mo. 2005).

Plaintiffs' response to this portion of Defendants' Motion for Summary Judgment states in its entirety as follows:

> (3) <u>MEMC Electronic willfully and intentionally interfered with these agreements and MEMC Electronic's actions caused MEMC Pasadena to breach the agreements, which caused actual damage to Plaintiffs</u>. Memc Pasadena is a wholly owned subsidiary of MEMC Electronic. PSF ¶ 1. MEMC Electronic controls MEMC Pasadena and caused MEMC Pasadena to breach its commission agreements with Plaintiffs by failing to pay the commissions that are the subject of this case.
>
> (4) <u>MEMC Electronic's actions were not justified</u>;John Kauffmann, the Rule 30(b)(6) corporate representative of both MEMC Electronic and MEMC Pasadena, testified that as far as he is concerned the Korea and China International Representation Agreements "do not exist". PSF ¶ 124. This untenable and cavalier position of an official corporate representative of both Defendants, when faced with contracts duly executed by MEMC's global polysilicon sales manager cannot be justified. At a minimum, there is a genuine issue of material fact whether such a position is justified.

(Plaintiffs' Opp., P. 15).

Upon consideration, the Court finds Plaintiffs' largely unsupported allegations insufficient to defeat Defendants' Motion for Summary Judgment. Plaintiffs offer no evidence of any action by MEMC Electronic that induced or caused the alleged breaches, nor do they offer evidence that any

such alleged interference was accomplished through improper means. Defendants' Motion for Summary Judgment on Count III of Plaintiffs' Complaint must therefore be granted.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment on Counts I-III (Sales Representation Documents) (Doc. No. 39) is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Counts I and II of Plaintiffs' Complaint is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment on Count III of Plaintiffs' Complaint is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 33) is **DENIED**.

Dated this 4th day of December, 2009.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE