UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SEMI-MATERIALS CO., LTD.       )
and SMC SHANGHAI,              )
                              )
        Plaintiff(s),          )
                              )
    vs.                       )        Case No. 4:08CV434 JCH
                              )
MEMC ELECTRONIC MATERIALS,     )
INC. and MEMC PASADENA, INC.,  )
                              )
        Defendant(s).          )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants MEMC Electronic Materials, Inc. ("MEMC Electronic") and MEMC Pasadena, Inc.'s ("MEMC Pasadena") (collectively "MEMC" or "Defendants") Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim, filed September 18, 2009. (Doc. No. 30). The matter is fully briefed and ready for disposition.

## BACKGROUND

Beginning in or around 1996, MEMC Pasadena entered into informal, short-term arrangements with World Tech Company (Semi-Materials Co., Ltd.'s predecessor in interest)[1], whereby MEMC Pasadena paid occasional commissions to Semi-Materials in exchange for assistance with the sale of silicon, and later silane. (Plaintiffs' Statement of Additional Facts in Opposition to Defendants' Motion for Summary Judgment on Damages ("Plaintiffs' Facts"), ¶ 57 and Defendants' Response thereto). The arrangements, entered into between Mr. Bob Onofrey, then MEMC Pasadena's Marketing Manager, and Mr. Kun Park, the President of Semi-Materials and a prior

---

[1] World Tech Company and Semi-Materials Co., Ltd., a Korean corporation, hereinafter collectively are referred to as "Semi-Materials." (Compl., ¶ 6).

employee of MEMC in Korea, were not the subject of any written agreement, but periodically may have been discussed or memorialized in e-mail exchanges. (Defendants' Response to Plaintiffs' Statement of Additional Material Facts Regarding Plaintiffs' Damages Claim ("Defendants' Response to Plaintiffs' Facts"), ¶ 57). Pursuant to the arrangements, MEMC Pasadena agreed to pay Semi-Materials a percentage commission on all sales of polysilicon by MEMC Pasadena to customers located in Korea. (Plaintiffs' Facts, ¶ 59).

When Mr. Onofrey left MEMC Pasadena, Mr. Sanjeev Lahoti took over his position as marketing and sales manager. (Plaintiffs' Facts, ¶ 60). From 2001 through 2004, Mr. Lahoti was MEMC's primary sales person responsible for sales of polysilicon and silane, and as such, he had primary customer contact with MEMC's customers for issues relating to the sales of such products. (Id., ¶ 39).[2] In his role as sales and marketing manager for polysilicon and silane gas at MEMC, Mr. Lahoti also handled, through MEMC Pasadena, the polysilicon sales of MEMC, MEMC's Italian subsidiary, and all of MEMC's companies worldwide. (Id., ¶ 38).

According to Plaintiffs, sometime between the years 2002 and 2004, Mr. Park, on behalf of Semi-Materials, and Mr. Lahoti, on behalf of MEMC Pasadena, signed a document captioned "International Sales Representation Agreement" (the "Korea Agreement"). (Defendants' Facts, ¶ 1, citing Defendants' Exh. A). The Korea Agreement stated that Semi-Materials was appointed MEMC Pasadena's "exclusive sales representative" in Korea for the sale of polysilicon and silane, and that MEMC Pasadena would pay Semi-Materials a commission on all polysilicon and silane sales that

---

[2] Defendants maintain that while Mr. Lahoti was the "first line" salesperson, he did not have absolute authority with respect to polysilicon and silane sales. (Defendants' Response to Plaintiffs' Facts, ¶ 39). Rather, Defendants assert the ultimate decision as to whether to enter into an agreement for the sale of those items was made by Mr. John Kauffmann, MEMC Electronic's Senior Vice President of Sales. (Id.; Defendants' Statement of Uncontroverted Material Facts in Support of Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim ("Defendants' Facts"), ¶ 28).

were, "purchased from [MEMC Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [Korea]." (Defendants' Facts, ¶ 2). The Korea Agreement further stated that it was to be in effect for an initial three-year term, from July 1, 2003, to June 30, 2006. (Id., ¶ 3).

Plaintiffs further allege that sometime between the years 2002 and 2004, Mr. Lahoti and Mr. Park executed a second document captioned "International Sales Representation Agreement" (the "China Agreement"). (Defendants' Facts, ¶ 4, citing Defendants' Exh. B). The stated parties to the China Agreement were MEMC Pasadena and SMC Shanghai ("SMC"). (Id., ¶ 5). Like the Korea Agreement, the China Agreement stated that SMC was appointed MEMC Pasadena's "exclusive sales representative" in China for the sale of polysilicon and silane, and that MEMC Pasadena would pay SMC a commission on all polysilicon and silane sales that were, "purchased from [MEMC Pasadena] by the user of the PRODUCTS and delivered by [MEMC Pasadena] to a site within [China]." (Id., ¶¶ 5, 6). Although the commission rates under the China Agreement purportedly were to be determined in accordance with Appendix A (Defendants' Facts, ¶ 6), no Appendix A accompanies the China Agreement. (Id.).[3] The China Agreement provided for an initial three year term, from January 2, 2004, to January 1, 2007. (Id., ¶ 7).

Plaintiffs filed their Complaint in this matter on March 31, 2008, alleging Defendants violated the Korea and China Agreements.[4] (Doc. No. 1). Specifically, Plaintiffs allege Defendants contracted

---

[3] Plaintiffs note that although Semi-Materials has been unable to locate a copy of Appendix A to the China Agreement, Mr. Park testified as to his understanding that, because the China Agreement contemplated sales of the same products from the same manufacturer, the commission rates were to be the same as under the Korea Agreement. (Plaintiffs' Statement of Material Facts as to which Genuine Issues of Fact Exist in Opposition to Motion for Summary Judgment as to Plaintiffs' Damages Claim, ¶ 6).

[4] Plaintiffs further allege MEMC Electronic interfered with a Subagent Agreement between Semi-Materials and SGL Carbon Korea, Ltd., a claim not at issue in the present motion.

to sell substantial quantities of polysilicon in both China and Korea, without paying Semi-Materials or SMC the required commissions. (Compl., ¶¶ 14-16, 19-20). Plaintiffs further allege Defendants sold silane in China to Ling Gas and Hwanan Special Gas during the terms of the China Agreement, without paying SMC the required commissions. (Id., ¶¶ 17-18).

As support for their damages claim, Plaintiffs disclosed an expert report by Ms. Patricia L. Pacey, PhD. (Defendants' Facts, ¶ 8, citing Defendants' Exh. C). Dr. Pacey purported to calculate the sales commissions allegedly due under both the Korea and China Agreements. (Id., ¶ 9). In order to do so, she reviewed invoices produced by MEMC during discovery, and calculated the alleged sales commission due under each invoice. (Id.). Based upon her analysis, Dr. Pacey concluded that a total of $12,554,300.00 in alleged unpaid commissions was due under the Korea and China Agreements collectively. (Id., ¶ 10).

As stated above, Defendants filed the instant Motion for Partial Summary Judgment on September 18, 2009. (Doc. No. 30). In their Motion, Defendants maintain there exist no genuine issues of material fact, and they are entitled to judgment as a matter of law as to, "certain overreaching and entirely unwarranted aspects of [Plaintiffs'] damages claim." (Id., ¶ 3). Specifically, Defendants assert Plaintiffs are not entitled to damages arising from: "(i) sales made by MEMC entities other than MEMC Pasadena; (ii) sales not delivered to the relevant territories; (iii) sales otherwise within the scope of the China [Agreement] but that occurred after December 31, 2006; and (iv) sales under the China [Agreement]." (Id., P. 4).

## SUMMARY JUDGMENT STANDARD

The Court may grant a Motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id</u>.

A moving party always bears the burden of informing the Court of the basis of its Motion. <u>Celotex</u>, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); <u>Anderson</u>, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of his pleading. <u>Anderson</u>, 477 U.S. at 256.

In passing on a Motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. <u>Id</u>. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. <u>Id</u>. at 249.

## **DISCUSSION**

## I. <u>Defendants Are Entitled To Summary Judgment On Plaintiffs' Claim For Commissions On Sales Outside The Alleged Agreements' Terms</u>[5]

In their Motion for Partial Summary Judgment, Defendants first assert portions of Plaintiffs' claim for damages must be denied, as they fall outside the express terms of the Korea and China Agreements. (Defendants' Memo in Support, PP. 4-9). The Court thus turns to a consideration of

---

[5] Defendants and the Court assume for purposes of the present motion that the alleged agreements themselves were valid. (Defendants' Memorandum in Support of Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim ("Defendants' Memo in Support"), P. 1).

the contract terms themselves.

### A.    Standards For Contract Interpretation

Under Missouri law, the interpretation of a contract, including whether it is ambiguous, is a question of law.  Skillington v. Activant Solutions, Inc., 2009 WL 3852804 at *4 (E.D. Mo. Nov. 17, 2009), citing Dorsch v. Family Med., Inc., 159 S.W.3d 424, 435 (Mo. App. 2005).  "The cardinal principle of contract construction is 'to ascertain the intention of the parties and to give effect to that intent.'"  Adbar Co., L.C. v. PCAA Missouri, LLC, 2008 WL 68858 at *4 (E.D. Mo. Jan. 4, 2008), quoting Butler v. Mitchell-Hugeback, Inc., 895 S.W.2d 15, 21 (Mo. 1995).  Under Eighth Circuit law, however, "when a contract uses plain and unequivocal language, it must be enforced as written."  Sligo, Inc. v. Nevois, 84 F.3d 1014, 1019 (8th Cir. 1996) (internal quotations and citation omitted).  Extrinsic evidence of the meaning of a contract term thus is admissible only when the contract is ambiguous.  Foam Supplies, Inc. v. The Dow Chemical Co., 2007 WL 4210354 at *2 (E.D. Mo. Nov. 27, 2007) (citation omitted).[6]  See also Adbar Co., 2008 WL 68858 at * 4 (internal quotations and citation omitted) ("If a contract is unambiguous, the intent of the parties will be gathered solely from the terms of the contract.").

"To determine whether a contract is ambiguous, [the Court] consider[s] the instrument as a whole, giving the words contained therein their ordinary meaning."  Schoemehl v. Renaissance Elec. Co., Inc., 2007 WL 2048669 at *3 (E.D. Mo. Jul. 12, 2007) (internal quotations and citations omitted).  "A contract is not ambiguous merely because the parties dispute its meaning."  Id. (citations omitted).

### B.    Contract Terms Regarding Sales Subject To Commission

---

[6] "The prohibition against considering extrinsic evidence in unambiguous contracts extends to considering the circumstances surrounding the contract's execution."  J.C. Penney Life Ins. Co. v. Transit Cas. Co. in Receivership, 2009 WL 3075356 at *4 (Mo. App. Sep. 29, 2009).

As stated above, the Korea and China Agreements were entered into between MEMC Pasadena, and Semi-Materials and SMC, respectively. (See Defendants' Exh. A, P. 1; Defendants' Exh. B, P. 1). The Agreements contained the following relevant provisions identifying the sales subject to payment of a commission:

1. **APPOINTMENT OF SALES REPRESENTATIVE/TERRITORY**
   The COMPANY[7] hereby appoints the SALES REPRESENTATIVE[8] as its exclusive sales representative in [S. Korea or China] (the "TERRITORY") for PRODUCTS (as defined below). The SALES REPRESENTATIVE is authorized to solicit and promote, but not consummate sales of PRODUCTS in the TERRITORY.

2. **PRODUCTS**
   As used herein "PRODUCTS" shall mean polysilicon and silane....

7. **COMPENSATION**
   (a)      The compensation paid to the SALES REPRESENTATIVE, by the COMPANY, will be a percentage of the NET SALES PRICE of PRODUCTS that are purchased from the COMPANY by the user of the PRODUCTS and delivered by the COMPANY to a site within the TERRITORY. The compensation percentage rates are listed in Appendix A.

(Defendants' Exh. A, PP. 1, 3; Defendants' Exh. B, PP. 1, 3).

## 1.      Sales By Entities Other Than MEMC Pasadena

As noted above, the Korea and China Agreements both allowed for commissions to be paid to Plaintiffs only on products purchased "from the COMPANY," defined in both agreements as MEMC Pasadena. In their damages calculation, however, Plaintiffs include allegedly unpaid commissions on sales made by other MEMC entities, including MEMC Electronic, MEMC Electronic Materials, SpA, and MEMC Singapore. (Defendants' Memo in Support, PP. 5-6). Defendants

---

[7] The "COMPANY" is defined in the Agreements as MEMC Pasadena. (Defendants' Exh. A, P. 1; Defendants' Exh. B, P. 1).

[8] The "SALES REPRESENTATIVE" is defined as Semi-Materials in the Korea Agreement, and SMC in the China Agreement. (Defendants' Exh. A, P. 1; Defendants' Exh. B, P. 1).

maintain that because none of those MEMC entities were identified, referenced, or alluded to in either of the alleged agreements, sales by such entities were not subject to commission payments. (Id., P. 6).

In response, Plaintiffs allege they do not seek damages for sales *made* by the other MEMC entities, but rather seek damages only for shipments *invoiced* by those entities but originating from sales by MEMC Pasadena. (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment as to Plaintiffs' Damages Claim ("Plaintiffs' Opp."), P. 8). In other words, Plaintiffs maintain shipment invoicing is not the dispositive indicator regarding who sold the product, and there is evidence MEMC Pasadena sold all MEMC's polysilicon and silane regardless of which MEMC entity invoiced the sale or received the purchase order. (Id., P. 10).

Upon consideration, the Court will deny this portion of Defendants' motion without prejudice. While the Court agrees with Defendants that pursuant to the unambiguous terms of the agreements, Plaintiffs are entitled to commissions only on sales of products purchased from MEMC Pasadena, and not from other MEMC entities, without more the Court is unable to determine which sales are included in that category. The Court thus finds it appropriate to allow Defendants to present evidence at trial that because MEMC Pasadena in general, and Mr. Lahoti in particular, only assisted in or facilitated some sales of products actually manufactured and sold by other MEMC entities[9], those sales are not subject to commission payments under the plain terms of the agreements. (See Defendants' Reply in Support of Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim, PP. 2-3).

## 2. Sales Not Delivered To Sites Within China Or Korea

---

[9] The Court's ruling is bolstered by Defendants' claim that many of the invoices indicating Mr. Lahoti as the salesperson are dated in late-2007 and early 2008, well after Mr. Lahoti's March, 2007, departure from MEMC Pasadena. (See Defendants' Response to Plaintiffs' Facts, ¶ 43).

Defendants next assert that under the clear terms of the agreements, Plaintiffs are not entitled to commissions on sales of products delivered to sites outside China or Korea. (Defendants' Memo in Support, PP. 6-7). Plaintiffs offer no response to this assertion. Upon consideration, the Court finds the requirement that the products be delivered, "to a site within the TERRITORY," defined as Korea or China respectively, is unambiguous, and so this portion of Defendants' Motion for Partial Summary Judgment must be granted.

### 3. Sales Not Delivered By MEMC Pasadena To The Site Within China Or Korea

As noted above, both agreements provided for compensation to be paid on sales of products, "delivered by the COMPANY [MEMC Pasadena] to a site within the TERRITORY [S. Korea or China]." (Defendants' Exh. A, P. 3; Defendants' Exh. B, P. 3). Defendants assert that although Plaintiffs thus are not entitled to commissions on sales of products delivered by MEMC Pasadena merely to MEMC Pasadena's own plant, or to a domestic shipping point, Plaintiffs' expert failed to consider the delivery terms of the transactions at issue, i.e., EXW[10], FOB[11], or FCA[12], in calculating

---

[10] The delivery term "EXW (Named Place)" or "Ex works", "means that the seller delivers when he places the goods at the disposal of the buyer at the seller's premises or another named place (i.e., works, factory, warehouse, etc.) not cleared for export and not loaded on any collecting vehicle." (Defendants' Facts, ¶ 18).

[11] The delivery term "FOB (Named Place)" or "Free on Board", "means that the seller delivers when the goods pass the ship's rail at the named port of shipment. This means that the buyer has to bear all costs and risks of loss of or damage to the goods from that point. The FOB term requires the seller to clear the goods for export. This term can be used only for sea or inland waterway transport. If the parties do not intend to deliver the goods across the ship's rail, the FCA term should be used." (Defendants' Facts, ¶ 20).

[12] The delivery term "FCA (Named Place)" or "Free Carrier", "means that the seller delivers the goods, cleared for export, to the carrier nominated by the buyer at the named place. It should be noted that the chosen place of delivery has an impact on the obligations of loading and unloading the goods at that place. If delivery occurs at the seller's premises, the seller is responsible for loading. If delivery occurs at any other place, the seller is not responsible for unloading....If the buyer nominates a person other than a carrier to receive the goods, the seller is deemed to have fulfilled his obligation to deliver the goods when they are delivered to that person." (Defendants' Facts, ¶ 19).

Plaintiffs' alleged damages.  (Defendants' Memo in Support, PP. 6-7).

By way of response, Plaintiffs assert the course of dealing between the parties reveals they never intended for the invoice delivery terms to allow MEMC Pasadena to avoid paying commissions on sales to customers located in Korea or China.  (Plaintiffs' Opp., PP. 10-13).  In other words, Plaintiffs maintain MEMC Pasadena repeatedly paid commissions on sales with invoice terms such as EXW prior to entering into the sales representation agreements, and continued to pay such commissions after the Korea Agreement went into effect.  (Id., P. 12).  Plaintiffs thus maintain the parties intended that MEMC Pasadena would continue to pay commissions to Plaintiffs for sales to China and Korea, regardless of the delivery terms included in MEMC Pasadena's invoices, and that Mr. Park never would have agreed to a contractual term stating otherwise.  (Id., PP. 10-13).[13]

Upon consideration, the Court finds it cannot consider Plaintiffs' evidence regarding the parties' course of conduct, because the contract term at issue is not ambiguous.  Rather, the agreements are clear that compensation was due only on sales of products delivered by MEMC Pasadena itself to a place within Korea or China.  As stated above, when a contract is unambiguous, its meaning must be determined solely from within the four corners of the document, and consideration of extrinsic evidence, including evidence regarding the parties' prior dealings, is not permitted.  Maritz Holdings, Inc. v. Federal Ins. Co., 2009 WL 2868842 at *7, 8 (Mo. App. Sep. 8, 2009).  This portion of Defendants' Motion for Partial Summary Judgment must therefore be granted.

### 4.        Sales Not Made Within The Specified Time Period

Defendants next assert Plaintiffs are not entitled to commissions on sales that occurred after the expiration of the China Agreement's recited term, i.e., January 1, 2007.  (Defendants' Memo in

---

[13] It is undisputed that the agreements at issue were reviewed by Mr. Park's counsel prior to their execution.  (Defendants' Facts, ¶ 36).

Support, PP. 7-9).  The China Agreement provided in relevant part as follows:

3.    **TERM AND SCOPE**
The term of this AGREEMENT shall be three (3) years commencing from January 02, 2004 to January 01, 2007, unless sooner terminated as hereinafter provided in Paragraph 8.B.  Thereafter, this AGREEMENT may be renewed for additional three (3) year terms upon agreement of both parties.  The provisions of this AGREEMENT shall govern all transactions between the COMPANY and the SALES REPRESENTATIVE pertaining to the PRODUCTS.  Thereafter, unless there is any dissent between two parties, this AGREEMENT shall automatically be extended for two years.  After automatic extention (sic) of the AGREEMENT, it shall be renewed every five years by mutual consent...

8.    **EXPIRATION-RENEWAL-TERMINATION**
A.    Though this AGREEMENT is not renewed by mutual consent given in writing by the parties hereto, it shall be automatically extended once for two years from the termination date of term specified in Paragraph 3.  This AGREEMENT shall be renewed every five years by mutual consent given in writing of both parties....

(Defendants' Exh. B, PP. 1, 5).  While maintaining the China Agreement's provisions regarding its temporal term "border on nonsensical," Defendants provide the following interpretation::

Paragraph 3 provides for an initial three-year term that may be renewed for an additional three-year term by agreement of the parties, and that, thereafter, (i.e., if the parties have agreed to and completed a second three-year term), the arrangement shall automatically renew for two years unless there is dissent between the parties.  Paragraph 8's reference to a two-year automatic renewal is therefore understood to refer to the two-year automatic renewal provided for in Paragraph 3 only if the parties agree to and complete a second three-year term.

(Defendants' Memo in Support, P. 8).

Plaintiffs conversely interpret Paragraph 8 of the China Agreement to provide for an automatic two-year extension from the termination date specified in Paragraph 3, even if the parties chose not to renew the agreement by mutual consent given in writing.  (Plaintiffs' Opp., P. 13).  Plaintiffs support their position by citing Mr. Park's testimony regarding his understanding that the China Agreement was subject to an automatic two-year renewal.  (Plaintiffs' Facts, ¶ 68).  Plaintiffs

thus maintain the China Agreement was in effect until January 1, 2009, and they are entitled to commissions accordingly.

Upon consideration, the Court finds the expiration terms in the China Agreement to be extremely ambiguous. "Where, as here, the contract is ambiguous, the intent of the parties must be established by extrinsic evidence and so a question of fact arises as to the intent of the parties to its meaning." Maritz Holdings, 2009 WL 2868842 at *7 (internal quotations and citation omitted). The Court thus will deny this portion of Defendants' Motion for Partial Summary Judgment. See id. (citation omitted) ("Determination of the parties' intent should be left to the jury.").

## II.     Defendants Are Entitled To Summary Judgment On SMC Shanghai's Claim For Commissions On Sales Under The Alleged China-Related Agreement Because There Is No Basis Whatsoever For The Proffered Commissions Rate

In their Motion for Partial Summary Judgment, Defendants finally assert Plaintiffs are not entitled to compensation under the China Agreement, because the agreement fails to provide any applicable percentage rate for the commissions. (Defendants' Memo in Support, PP. 10-11). As support for this contention, Defendants note that although the commission rates under the China Agreement were to be determined in accordance with Appendix A, no Appendix A accompanies the document. (Id.).

A latent ambiguity in a contract arises when a writing is clear and unambiguous on its face, but the meaning is made uncertain due to collateral matters. Emerald Pointe, L.L.C. v. Jonak, 202 S.W.3d 652, 659 (Mo. App. 2006). Latent ambiguities arise where the contract cannot be executed due to the ambiguity. See Smith v. Taylor-Morley, Inc., 929 S.W.2d 918, 923 (Mo. App. 1996). Since latent ambiguities are not apparent on the face of the document, extrinsic evidence is admissible to show the real intent of the parties. Royal Banks of Missouri v. Fridkin, 819 S.W.2d 359, 362 (Mo. 1991).

In the instant case, Plaintiffs note that during his deposition, Mr. Park testified as to his understanding that because the China Agreement contemplated sales of the same products from the same manufacturer, the commission rates were to be the same as for the Korea Agreement. (Plaintiffs' Opp., P. 15). While Defendants point to potential contradictions within his testimony, the Court nevertheless finds this extrinsic evidence sufficient to create a fact issue as to the parties' intent with respect to the commission rates. This portion of Defendants' Motion for Partial Summary Judgment will therefore be denied.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Partial Summary Judgment as to Plaintiffs' Damages Claim (Doc. No. 30) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.


Dated this 4th day of December, 2009.


                                        /s/ Jean C. Hamilton
                                        UNITED STATES DISTRICT JUDGE